## Moss et al. *v.* Smoker et al.

Plaintiffs, owners of a steamer, received on their boat a quantity of cotton, to be delivered to the consignees for a certain freight. They were allowed, by the terms of the bills of lading, to reship the cotton on another boat. The cotton was reshipped on a steamer belonging to defendants, to be carried a part of the distance. The bills of lading were transferred to the latter, who, after deducting the amount agreed to be allowed to them for freight for the distance it was to be carried by them, paid plaintiffs an amount in cash, and gave them a note and a due bill, which together made up the full amount of the original freight contracted to be paid by the owners of the cotton for its transportation to the place of consignment. The cash was paid without any stipulation for its return in any future event, and the note and due bill were absolute on their face; nor was any condition stated in what passed orally between the parties. The cotton was lost by an unavoidable peril of the navigation shortly after it was reshipped, and the defendants were thus prevented from delivering the cotton and earning the freight, and never received any part thereof. In an action by the payees on the note and bill: *Held* that, by the absolute form in which defendants stipulated, they have subjected themselves to the burden of establishing their release by some implied condition resulting from the nature of the contract, if any such existed; that the peril to which the goods would be exposed, and with them the right to freight, was one that might have been easily foreseen; that the chance of earning freight and of re-imbursing themselves for any payments to the plaintiffs by collecting the entire freight of the consignees, was a benefit offered to the defendants, which they thought it their interest to

---

Moss
*v.*
Smoker.

accept with the accompanying burden; and that they took upon themselves the risk of the whole amount of freight money.

Where the business of a steamer is to carry freight for hire, an agreement made by the captain, or clerk of the boat, in order to obtain the carriage of merchandize and to earn freight for the owners, is within the scope of the partnership business; and notes executed in pursuance of it by the clerk, on behalf of the owners, will be binding on the latter.

APPEAL by the defendants from a judgment rendered against them by the Fourth District Court of New Orleans, *Strawbridge,* J. *Micou,* for the plaintiffs, relied on the case of *Andrew* v. *Moorehouse,* cited in Abbott on Shipping, new Am. ed. p. 495, and note to page 496. *T. G. Lacy, Hunton* and *Rawle,* for the appellants, cited *Avery* v. *Lauve,* 1 An. R. 457. The judgment of the court was pronounced by

Slidell, J. This suit is brought by the plaintiffs, owners of the steamer *Hempstead,* against the defendants, owners of the steamer *Express Mail,* to recover the amount of two due bills, signed by the clerk of the latter steamer, on behalf of her owners. One is in the following form:

"Shreveport, April 24, 1846. One day after date due to the order of *Mr. Wm. Moss,* four hundred dollars, for value received.

"Steamer *Express Mail* and owners, *R. Gillet,* clerk."

The other is dated at the same place, on the 26th April, 1846, is signed in the same way, and is of the following tenor: "Due to the steamer *Hempstead* and owners, three hundred and ninety-four dollars, for value received."

At the trial of the cause, in addition to some other evidence, the following statement of facts was agreed upon between the plaintiffs and a portion of the defendants.

"The note and due bill mentioned in the petition were given under the fol- lowing circumstances: The steamer Hempstead, in the month of April, 1846, received on board and undertook to transport from Harris' Landing on Red river to New Orleans, 396 bales of cotton, consigned to *Messrs.* ————— of New Orleans, the damages of the river excepted. The consignees to pay freight on 362 bales at $3 per bale, and on 34 bales at $2 50 per bale. By the terms of the bill of lading the steamer Hempstead had the privi- lege of reshipping the cotton on other steamboats. The Hempstead trans- ported the cotton to Shreveport, and the cotton was then by agreement reshipped on the Express Mail; $200 in cash paid, and the note and due bill given by the Express Mail, and a freight of 75 cents reserved for the Express Mail; the said Hempstead delivering and passing the bills of lading to the Express Mail. Afterwards, on the 27th of April, 1846, the Express Mail, about fifty miles below Shreveport, on her voyage to New Orleans with the said cotton on board, was, by the unavoidable dangers and perils of the river, lost, and was unable to deliver the cotton to the consignees, and thus to earn the freight, and never did receive the freight, or any part thereof. On the said voyage the freight of the said Express Mail was to the amount and value of $2,071, upon which insurance had been made to the amount of $980, which has been paid defendants."

The plaintiffs contend that, under the agreement, the defendants became their unconditional debtors for the amount of the notes or due bills, while, on the other hand, the defendants invoke an entirely different construction. They say that the cash paid and the notes given were an advance by the defendants to the plaintiffs, to be re-imbursed by the collection of the entire freight at

New Orleans upon the original bills of lading, that the defendants did not take the plaintiffs' claim for freight at their own risk; that by the loss of the goods on the voyage the freight was lost, and they were unable to collect from the consignees; that the consideration of the notes has failed; that they are entitled to a judgment in their favor as to the notes, and to a decree against the the plaintiffs for the re-imbursement of the cash advance of $200.

The question presented by this cause is novel, and one in which, as the counsel properly stated, we cannot derive much aid from precedent and special authority. Its solution must be attained by the application of those well-established principles which control the subject of contracts in general, and some aid may also be drawn from those familiar rules which regulate the obligation of promissory notes. The true enquiry in this case is, was the promise to pay, made by the defendants, absolute? or was it conditional, to wit, upon the condition of the safe arrival of the cargo, and the consequent ability to collect the freight from the consignees? A conditional obligation is one which is made to depend upon an uncertain event. If the obligation is not to take effect until the event happens, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition. It is certainly usual in agreements, as Domat has well said, for the parties to foresee accidents that may produce some change which they are willing to guard against; they therefore, said he, regulate what shall be done if those cases do happen.

It is not, however, indispensable to the existence of a condition in a contract, that it be expressed. There are tacit conditions, which are understood without being expressed. But this class of conditions is limited to those which are inherent in the nature of the affair, and which the law supplies, though the contracting parties are silent. Our Code defines them perhaps more correctly and fully, as those which result from the operation of law, from the nature of the contract, or from the presumed intent of the parties. An illustration is given by the civilians in the case of the sale of an estate, when the seller reserves to himself the fruits of that year. This reservation implies the condition that there shall grow fruits, in the same manner as if it had been said that he reserved the fruits in case there should be any. *Tunc enim incipit actio cum ea per rerum naturam prestari potest.* Another illustration is the resolutory condition which is implied in all commutative contracts, to take effect in case either of the parties does not comply with his engagements. See Civil Code, arts. 2015, 2016, 2021, 2040. Domat, book 1, tit. 1, sec. 4, § vi. Merlin, Répert. *verbo* Condition. Duranton, book 3, tit. 3, chap. 4, § 37.

If we examine the present contract, we look in vain for any express stipulation of a condition that the notes should not be exigible, and that the cash paid should be restored in case the goods should not arrive, and the liability of the consignees not be fixed by their delivery. The cash was paid without any positive stipulation for its return in any future event. The notes are absolute on their face. It is an absolute promise to pay, for value received, a certain sum; in one note at a certain day, in the other immediately. Nor was any condition stated in what passed orally between the parties. The defendants therefore are totally unsupported by the express terms of the agreement, and must show that the implied condition results from the operation of law, the nature of the contract, or the presumed intent of the parties. Now there is no express legislation to control a contract of this sort, and the defendants are therefore

restricted to whatever benefit may be derived from a consideration of "the nature of the contract, or the presumed intent of the parties."

Standing upon this narrow ground, the first difficulty which the defendants encounter is, that the whole burden is thrown upon them by the absolute form in which they have expressly stipulated. It is obvious that to relieve themselves from a written promise, unconditional on its face, they must make out the implied condition by very clear and cogent deductions from the nature of the contract. Now the peril to which the goods would be exposed, and with the goods the right of freight, was a peril not so strange or extraordinary as not be foreseen by men of ordinary prudence. The risk was not of so improbable a nature as not to suggest itself to the contemplation of the parties. But it is said that, if the contract is deemed an absolute one, and the defendants took the risk of earning freight from the consignees, they made a hard bargain. Certainly where a bargain is so unconscionable as to indicate surprise, or fraud, or duress, a court of justice will look into it very closely, and in a proper case might render such sum as may appear reasonable, without being bound by the terms of the contract. But here was no sort of coercion, nor any hardship but of the promissor's own making. There was a lawful and valuable consideration moving from the plaintiffs. You shall have the chance of earning seventy-five cents per bale upon this cotton by carrying it to New Orleans, as well as the chance of reimbursing yourself by collecting the entire freight from the consignees, if you will pay me, who have already labored and incurred risk in the matter, the proportion of freight money from the place of shipment to the point where we now are. Here was clearly a valuable consideration. There was a benefit offered to the party promising, which he thought it to his interest to accept with its accompanying burden, and did accept. He did it with his eyes open; the risk he incurred was one which he must be supposed to have foreseen; and which he could have guarded against by either refusing the contract altogether, or insisting upon a condition, instead of promising absolutely. He had the chance of earning $297. Opposed to this was the risk of the loss of that amount, and of the sums paid and promised to the plaintiffs. Such a risk no underwriter would probably estimate at more than one per cent, or about ten dollars.

We are of opinion therefore that the defendants took the risk of the whole freight money upon themselves; and that, as between the parties now before us, and so far as the freight money was concerned, the interest of the plaintiffs in the enteprise was closed. The defendants bought out the plaintiffs unconditionally, and must pay the price.

In considering this case we have not thought proper to embarrass the subject with an enquiry, which is not necessary to the solution of the question before us, to wit, whether, notwithstanding the privilege of reshipment, the Hempstead remained liable to the consignee under the original bill of lading. That was one contract, and the agreement between the Hempstead and the Express Mail was a new and distinct contract. Each stands on its own footing. The rights of the owners of the steamers *inter se*, for the purposes of the present controversy, are not affected by their responsibility to the merchant.

It only remains to notice the grounds of defence urged by one of the defendants, *Boyle*. He does not dispute his being part owner of the Express Mail, but says he never authorized the captain or clerk to make such an agreement for him, and that they had no authority to make promissory notes for him.

Moss
*v.*
Smoker.

Upon the first of these points we are of opinion that the agreement was within the scope of the partnership business. The business of the steamer was to carry freight for hire, and the agreement was made in order to get the carriage of the cotton, and earn freight for the owners.

Upon the second point the objection is, in the present case, purely technical. If the whole agreement and its attendant circumstances were not in evidence, and the case before us nakedly upon the notes, the enquiry would then be necessary, whether the owners of a steamer are bound by notes drawn by the steamer's captain or clerk. But here the consideration of the notes is alleged and proved.

We are better satisfied with the conclusion we have formed in this case, from its concurrence with the views expressed by the learned and experienced judge who tried the cause in the court below, and who has given at length and very forcibly his reasons for deciding the cause in favor of the plaintiffs.

*Judgment affirmed.*